[Civ. No. 30032. Fourth Dist., Div. Three. May 31, 1984.]

LORETTA M. RUDNICK, Plaintiff and Appellant, v.
GOLDEN WEST BROADCASTERS, Defendant and Respondent.

794

**COUNSEL**

Martin N. Daniel for Plaintiff and Appellant.

Shields, Anderson & Garrison and Marc S. Soble for Defendant and Respondent.

OPINION

**CROSBY, J.**—Loretta Rudnick was struck by a foul ball during a California Angels baseball game. She appeals from a judgment of dismissal of her personal injury action against the team's corporate owner, Golden West Broadcasters, after a defense motion for summary judgment was granted.

I

Rudnick was struck by the ball while seated in an unscreened section of Anaheim Stadium in the area near first base. Her complaint alleged Golden West was an occupier of land who "invited the public to attend and observe baseball games at Anaheim Stadium . . . for a stipulated admission fee." Two causes of action were stated, one for negligent construction, maintenance, operation, and repair of the stadium's premises and a second for breach of an implied warranty that spectators sitting in the stadium's unscreened areas would be sufficiently protected from baseballs which might be hit in their direction. Golden West's motion for summary judgment did not differentiate between the two theories of liability.

Golden West answered and denied the allegations of the complaint, pleading affirmative defenses of contributory negligence and assumption of risk. After some discovery, Golden West moved for summary judgment. The motion was supported by the declaration of the director of stadium operations which stated, "I have held this job since December 1980. I am responsible for the day to day operations and running of Anaheim Stadium. As such I have knowledge regarding the screening on the ball field where the California Angels play. [¶] The width of the backstop screen is 69 feet, 10 inches. The height is 12 feet 5 inches from playing field to top. The screen covers spectators completely in [the] homeplate [*sic*] area as [the] screen backstop is affixed to netting that runs up to the corner part of the press box. The width of the screen covers the area behind home plate that would also include a portion of the seating toward each dugout. The screen is composed of number nine gauge steel wire mesh. The guidelines are composed of ¾-inch steel bridge strands, while the uprights are ½-inch steel. [¶] The screen at Anaheim Stadium covers approximately 2,300 seats. It is placed in the areas as described because this is where the vast majority of the foul balls are hit. The screen is in place for every [A]ngels' game and was in place on [the date of Rudnick's injury]."

Golden West also argued Rudnick voluntarily sat in the unscreened area with knowledge foul balls commonly enter the stands there and supported this contention with excerpts from her deposition. In opposition, Rudnick claimed the comparative negligence of the parties presented a triable issue

of fact. She stated in her own declaration she was relatively unfamiliar with the game of baseball, assumed unscreened sections of the stadium were safe for spectators, and was previously unaware of the danger posed by errant balls.

The trial court granted Golden West's summary judgment motion based on *Quinn* v. *Recreation Park Assn.* (1935) 3 Cal.2d 725 [46 P.2d 144]. *Quinn* held spectators who choose to sit in unscreened seats assume the risk of being struck by batted balls and management has no duty to protect them so long as a sufficient number of screened seats are provided for those who might request them.

## II

■ Assuming *Quinn* is still the law, the declaration of the stadium manager is nevertheless insufficient to support the judgment. It utterly fails to demonstrate "screened seats are provided for as many [fans] as may be reasonably expected to call for them on any ordinary occasion." (*Quinn* v. *Recreation Park Assn., supra,* 3 Cal.2d at p. 729.) The declaration blandly notes 2,300 screened seats are provided without mentioning what is a matter of common knowledge: the Angels regularly draw crowds 10 to 20 times that size.

Moreover, the declaration makes no effort to correlate the number of screened seats with the number of requests reasonably to be expected for them and does not allege *any* screened seats are truly available to fans who are not longtime season ticket holders. By contrast, the ballpark reviewed in *Quinn* provided more than twice as many screened seats as Anaheim Stadium does and was only one-fourth the size. Accordingly, under its own legal theory Golden West Broadcasters did not carry its burden on the motion, and the judgment must be reversed.

## III

The balance of the opinion represents only the view of the author, as Justice Sonenshine concurs solely in the preceding parts and Justice Trotter concurs separately. (See *Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675, 681 [88 Cal.Rptr. 500].) ■ These additional thoughts are intended to answer Rudnick's chief contention on appeal which is adopted in the concurring opinion. Rudnick argues the *Quinn* rationale has been wholly eliminated by the holdings in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] and *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]. Not so.

The liability of a baseball team to the spectators remains unchanged under modern California tort theory because the scope of the duty of care required of management established in *Quinn* has not been affected by recent changes in the law. As one respected authority states, "when the plaintiff has *reasonably* assumed a risk (e.g., sat in a baseball stadium in an area without protective screening), his conduct will not be considered as 'fault' under comparative negligence. Rather, the court will decide whether the defendant breached a 'duty' to the plaintiff. In the baseball case, the question would be whether defendant discharged his duty by providing some protective screening and warning of the risks involved." (Schwartz, Comparative Negligence (1975 special Cal. supp.) § 2(D), p. 4.)

The law has traditionally treated the national pastime in a *sui generis* manner.[1] In 1935, when ordinary assumption of risk could be an absolute bar to a plaintiff's recovery, the Supreme Court fashioned the special rule in *Quinn* for baseball spectators who chose to sit behind home plate: they did *not* assume the risk. Management had an overriding duty to provide screened seats for a reasonable number of patrons. (*Quinn* v. *Recreation Park Assn.*, *supra*, 3 Cal.2d at p. 729.)

In *Ratcliff* v. *San Diego Baseball Club* (1938) 27 Cal.App.2d 733 [81 P.2d 625], a spectator was struck by an errant bat as she walked in an unscreened aisle on the way to her screened seat. The court observed flying bats were not an ordinary threat to aficionados of the game, and the accident could have been avoided if the existing home plate screen had been extended "an additional two or three feet." (*Id.*, at p. 736.) In the court's view, management breached its duty of care to protect spectators from an unusual, but not unforeseeable, risk. The phenomenon of a baseball bat flying into the stands was not so common as to charge a fan with assumption of that risk, however; judgment for plaintiff was affirmed.

A directed verdict for the defense was affirmed in *Brown* v. *San Francisco Ball Club* (1950) 99 Cal.App.2d 484 [222 P.2d 19], where an adult plaintiff was struck by an erratically hurled ball in an unscreened seat near the first base line. The court emphasized the ballclub's limited duty to paying customers: "respondent fully discharged its duty toward appellant, as concerns the risk to her of being hit by thrown or batted baseballs, when it provided screened seats for all who might reasonably be expected to request them, in fact many more screened seats than were requested. Hence, the *injury suffered by her when struck by a thrown ball, while voluntarily occupying an unscreened seat, did not flow from, was not caused by, any failure of*

---

[1] The practice continues in the "modern era" and in a variety of contexts. (See, e.g., *Flood* v. *Kuhn* (1972) 407 U.S. 258 [32 L.Ed.2d 728, 92 S.Ct. 2099].)

*performance by respondent of any duty owed her, and did not give rise to a cause of action in her favor against respondent for damages for such injury.*" (*Id.,* at p. 488, italics added.)

*Brown* is noteworthy for its careful distinction between the concepts of traditional assumption of risk by plaintiff and defendant's duty of care; and the decision is based as much on the finding of no duty—and hence, no negligence by the defendant—as on assumption of risk by plaintiff: "the evidence . . . does not take her outside the application of the rule announced in [*Quinn*]; . . . she assumed the risk of injury in respect to which she complains; . . . the *injury was not caused by any negligence upon the part of the respondent; and . . . determination thereof was a proper function of the trial court upon motion for directed verdict.*"[2] (*Id.,* at p. 492, italics added.) No court has ever criticized, much less overruled, the definition of management's duty to the fans of *Quinn* and its progeny; and many have followed it since.

## IV

In *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, the Supreme Court abandoned the doctrine of contributory negligence in favor of a system of comparative fault and abolished *unreasonable* assumption of risk as a defense, the form which overlaps contributory negligence, i.e., where the "plaintiff's conduct in encountering a known risk may be in itself unreasonable, because the danger is out of all proportion to the advantage which he is seeking to obtain . . . ." (Prosser, Torts (4th ed. 1971) § 68, pp. 440-441, fn. omitted.) Did *Li* change the duty rules uniquely applicable to baseball, where the plaintiff's conduct in choosing a seat has invariably been viewed as reasonable? No. In fact, the Supreme Court explicitly noted reasonable assumption of risk involved "a reduction of defendant's duty of care. [Citations.]" (*Li* v. *Yellow Cab Co., supra,* at p. 825.) This statement is perfectly compatible with the holdings in *Quinn* and its progeny that the management of a baseball stadium simply has no duty to screen all seats.

■ Reasonable implied assumption of risk is one of three forms of assumption of risk. The other two are express assumption of risk, where "plaintiff, in advance, gives consent to relieve defendant of a legal duty and to take his chances of injury from a known risk" (*Gonzalez* v. *Garcia* (1977)

---

[2]Moreover, the court rejected plaintiff's argument "she was ignorant of the game of baseball and the attendant risks, hence [could not] be said to have knowingly assumed the risk," noting plaintiff "was a mature person in possession of her faculties with nothing about her to set her apart from other spectators and require of her a lower standard of self-protection from obvious, inherent risks than that required of other spectators." (*Id.,* at p. 488.)

75 Cal.App.3d 874, 878 [142 Cal.Rptr. 503]), and unreasonable implied assumption of risk, where plaintiff, by negligent conduct, is held to agree to relieve defendant of a legal duty. Only the last was affected by *Li*. For example, one who voluntarily rides in an automobile knowing the driver is intoxicated acts unreasonably and evinces "a lack of due care for [one's] own safety" (*id.*, at p. 881); but under *Li*'s comparative fault doctrine the action is not barred. Damages are simply reduced by the percentage of plaintiff's fault.

These views are consistent with those in vogue among legal scholars, such as Professor Schwartz, who would abandon the plaintiff's reasonable assumption of risk theory in favor of an eliminated or diminished duty of care by the defendant: "a number of *fact patterns that look like reasonable implied assumption of risk may still result in a verdict for defendant* [under a system of comparative fault], *if they are recast under the duty concept.* For example, in Wisconsin, a spectator injured at a ball park by a batted ball would have been barred from recovery under prior law by the implied assumption of risk defense. It is far from certain that such a plaintiff would be able to recover in Wisconsin today. The court might hold the duty of a baseball club extends only to providing an adequate screened area and warning those who choose not to sit in the screened area." (Schwartz, Comparative Negligence (1974) § 9.4, pp. 168-169, italics added, fns. omitted.) Notably, the Supreme Court cites Professor Schwartz' treatise numerous times in *Li*.

One leading text observes, "Most of the conduct of a visitor that was formerly characterized as assumption of risk is now viewed as a form of contributory negligence. . . . However, there may remain instances in which a visitor is deemed to have agreed to relieve defendant of an obligation of reasonable conduct toward him, thus reducing the defendant's duty of care. . . . [¶] *It is uncertain how assumption of risk concepts will now be applied when a spectator at or participant in a sport or recreational activity is injured.* Formerly, a spectator or participant assumed the ordinary, expected, or commonly known risks of the event. [Citations.]" (Cal. Tort Guide, Second Edition (Cont.Ed.Bar 1979) § 10.30, p. 189, italics added.)

Professor Fleming adds, "consent may still reduce or extinguish the defendant's duty of care rather than constitute a defense to his breach of duty. [Fn. omitted.] *The familiar rules for example, that a participant or spectator of a sporting event cannot complain of risks inherent in the game, . . . can be as well explained on the ground that the defendant was simply not negligent because he had no responsibility for those risks,* as on the ground that the plaintiff had assumed them. [Italics added.]" (Fleming, *The Supreme*

*Court of California 1974-1975: Comparative Negligence at Last—By Judicial Choice* (1976) 64 Cal.L.Rev. 239, 264.) Fleming concludes, "the future relation between assumption of risk and comparative negligence [in California] . . . require[s] the safety valve of 'no duty' for continued recognition of certain isolated instances of reasonable assumption of risk." (*Id.*, at p. 266.) Courts in other jurisdictions are split as to the role reasonable assumption of risk will occupy in the comparative fault scheme,[3] and there appears to be but one post-*Li* California opinion dealing with the issue (*Segoviano* v. *Housing Authority* (1983) 143 Cal.App.3d 162 [191 Cal.Rptr. 578]).[4]

V

*Rowland* v. *Christian, supra,* 69 Cal.2d 108 has, if anything, less impact than *Li* on the settled principles of the baseball cases. *Rowland* has nothing to do with *Quinn*'s definition of a baseball club's duty to its fans. ▮ *Rowland* is of principal significance for eliminating the plaintiff's status, i.e., invitee, licensee or trespasser, as a crucial factor in determining a landowner's liability. But paying baseball fans have always been invitees. It is not logical to suggest *Rowland* impliedly improves their status even further.

Also, *Rowland* addresses the issue of a landowner's duty of care where the risk of injury is not obvious. (*Id.*, at pp. 111, 119.) That is clearly not this case. Rudnick has cited no authority disputing the conclusion in *Quinn, Brown,* and numerous other cases that the risk of encountering a foul ball is "a common, expected, and frequent occurrence in every baseball game." (*Goade* v. *Benevolent etc. Order of Elks* (1963) 213 Cal.App.2d 189, 194 [28 Cal.Rptr. 669].)

---

[3]Professor Schwartz notes Connecticut, Florida, Massachusetts, New York, and Oregon, states adopting comparative fault, have abolished all forms of implied assumption of risk as a defense. (Schwartz, *supra,* (1981 pocket supp.) § 9.4, p. 77; fns. omitted.) Arkansas, Georgia, Mississippi, Nebraska, Rhode Island, and South Dakota "have, under comparative negligence, retained implied assumption of risk as a separate and complete defense to an action based on negligence." (*Id.*, at § 9.3, p. 75; fns. omitted.)

[4]The analysis in *Segoviano* v. *Housing Authority, supra,* 143 Cal.App.3d 162 is suspect. Although *Segoviano* correctly notes the conduct of plaintiff in a negligence action may be reasonable as a matter of law (*id.*, at p. 164), it goes too far in saying "only when the plaintiff expressly agrees to assume the risk [is] the defendant . . . relieved of a duty of care toward the plaintiff, thus barring any recovery." (*Id.*, at pp. 169-170.) While the concepts of "express" versus "implied" assumption of risk were well known in 1975 when *Li* was decided, the Supreme Court ignored them and focused only on the reasonableness of plaintiff's conduct. Moreover, *Segoviano*'s holding that implied consent, i.e., conduct by a plaintiff, cannot reduce or eliminate defendant's duty appears contrary to *Li*'s express acknowledgement that reasonable conduct involves precisely that.

Moreover, *Rowland* explicitly recognizes summary judgment for the defense based on a finding of no duty or breach of duty as a matter of law is still possible in a premises liability case: "Under the circumstances, a summary judgment is proper in this case only if, after proof of such facts, a judgment would be required as a matter of law for [defendant]." (*Id.,* at p. 111.) Finally—and of critical importance under our facts—*Rowland* "does not generally abrogate the decisions declaring the substantive duties of the possessor of land to invitees nor those establishing the correlative rights and duties of invitees." (*Beauchamp* v. *Los Gatos Golf Course* (1969) 273 Cal.App.2d 20, 27 [77 Cal.Rptr. 914].)

As to the determination of duty in tort cases, the Supreme Court consistently holds, "Duty is primarily a question of law . . ." (*Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 705 [194 Cal.Rptr. 805, 669 P.2d 41]) and is determined by balancing public policy considerations. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) Moreover, it has long been recognized that "the proper conduct of a reasonable person under particular situations may become settled by judicial decision . . . ." (*Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 587 [177 P.2d 279].) Under those circumstances, whether the defendant has conformed to the settled standard of conduct may be a question of law and not fact. (*Brown* v. *San Francisco Ball Club, supra,* 99 Cal.App.2d 484.)

The concept of legally settled parameters of duty survives both *Li* and *Rowland*: "Under Civil Code sections 1708 and 1714 the trier of fact has the burden not only of deciding what the facts are, but what any *unformulated* standard is of reasonable conduct . . . under like circumstances. (*Beauchamp* v. *Los Gatos Golf Course* [*supra*] 273 Cal.App.2d 20, 26.)" (*Slater* v. *Alpha Beta Acme Markets, Inc.* (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264].) In the case of injury to a spectator, the baseball club's standard of reasonable conduct is anything but unformulated. *Quinn* defined the baseball club's duty as it related to spectators in unscreened seats, and *Brown* reaffirmed that the defendant who satisfies *Quinn*'s screening standard is not negligent as a matter of law. *Li* and *Rowland* do not invalidate these holdings, nor do they make the landowner strictly liable for all injuries occurring on the premises. Even after *Li,* "the plaintiff may not recover without first establishing his case. A California plaintiff must still establish a prima facie case by proving that the defendant was negligent, and that that negligence was a proximate cause of his injuries, before there is anything against which his own negligence can be compared. Where either element of proof is lacking a nonsuit is justified [citations] . . . ." (*Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650,

657 [136 Cal.Rptr. 203].) This rule is the same whether the plaintiff's conduct is reasonable or unreasonable.

Despite the enormous changes in California tort law over the last 50 years, there is no reason to doubt the continuing vitality of the duty analysis of the *Quinn* line of cases. A baseball club complying with *Quinn*'s screening standard has fulfilled its limited duty to spectators as a matter of law and is entitled to summary judgment. Whether baseball fans are viewed as participants in the game itself (*Brown* v. *San Francisco Ball Club, supra,* 99 Cal.App.2d at p. 487) or merely passive spectators, one thing is certain: the chance to apprehend a misdirected baseball is as much a part of the game as the seventh inning stretch or peanuts and Cracker Jack. Reasonable screening is defined in the expectations of the fans and the traditions of the national pastime itself. The law of torts imposes no higher standard.[5]

Judgment reversed. Rudnick to recover her costs on appeal.

Sonenshine, J., concurred in parts I and II only.

**TROTTER, P. J.**—I concur in the result only.

My colleagues are correct in holding the trial court erred in granting summary judgment in favor of defendant; however, I cannot accede to their rationale. They find, quite remarkably, that *Quinn* v. *Recreation Park Assn.* (1935) 3 Cal.2d 725 [46 P.2d 144], decided almost 50 years ago, is still a beacon of enlightened tort law. Supported only by secondary authority (Professors Schwartz and Fleming) they ignore or misapply our Supreme Court's landmark holdings in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] and *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]. In clinging to the duty imposed in the "good old days," they turn away from the basis and strength of our common law system.

" 'In California as in other jurisdictions of Anglo-American heritage, the common law "is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or for protection against wrongs, but is rather the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice and adopted by

---

[5]It is doubtful any seats behind the screen are ever available from the box office for a single Angels game at Anaheim Stadium. Application of *Quinn* is thus really a means of imposing a more certain burden on Golden West. It has but two choices: (1) provide adequate numbers of unreserved, screened seats or (2) secure insurance coverage for the statistically predictable numbers who will suffer injury by spreading the cost to all the patrons. I suspect the latter approach is more economical, more practical—and presently in effect.

common consent for the regulation and government of the affairs of men. . . . [¶] The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country.'" (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 393-394 [115 Cal.Rptr. 765, 525 P.2d 669]; 15A Am.Jur.2d, Common Law, §§ 1, 3, pp. 594-596, 597-598.)

"'"This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law.' (*Hurtado* v. *California* (1884) 110 U.S. 516, 530 [28 L.Ed. 232, 237, 4 S.Ct. 111, 118].)

"'But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it: "The nature of the common law requires that each time a rule of law is applied, it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice." (Fns. omitted.) (15[A] Am.Jur.2d, Common Law, [§ 3], p. [599].) Although the Legislature may of course speak to the subject, in the common law system the primary instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them.' (*Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382, 394.)" (*Butcher* v. *Superior Court* (1983) 139 Cal.App.3d 58, 62-63 [188 Cal.Rptr. 503].)

It appears clear to me the *Quinn* rationale has been abrogated by the holdings in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, and *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804. *Rowland* held the liability of a land occupier is to be determined in accordance with the policy behind Civil Code section 1714[1] ". . . that everyone is responsible for an injury caused to another by his want of ordinary care or skill in the management of his property." (*Id.,* at p. 119.) The *Rowland* court concluded the applicable liability test for a possessor of land under Civil Code section 1714 "is whether in the management of his property he has acted as a reasonable

---

[1]Civil Code section 1714 provides in part as follows: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. . . ."

man in view of the probability of injury to others" independently of considerations regarding the status of the plaintiff as a trespasser, licensee or invitee. (*Ibid.*) *Rowland* thus marked a significant departure from prior adherence to rigid common law classifications which blindly conditioned a given plaintiff's right to recovery.

As stated in *Beauchamp* v. *Los Gatos Golf Course* (1969) 273 Cal.App.2d 20 [77 Cal.Rptr. 914], the *Rowland* decision effectively "transmuted" the liability issue from a matter of law to a question of fact for the jury: ". . . namely, whether a possessor of land even in respect to the obvious risk has acted reasonably in respect to the probability of injury to an invitee; and whether or not the invitee used the property reasonably in full knowledge of any obvious risk entering into a subsequent injurious incident. [Citations.]" (*Id.*, at p. 33.)

"Defendant's standard of care under Civil Code section 1714, the foreseeability of harm, and the reasonableness of defendant's conduct are questions for the trier of fact." (*Slater* v. *Alpha Beta Acme Markets, Inc.* (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264].) The function of the trial court in passing on a summary judgment motion is not to determine an issue of fact (i.e., reasonableness), but to determine whether an issue of fact does, in fact, exist. (*Church* v. *Arko* (1977) 75 Cal.App.3d 291, 295 [142 Cal.Rptr. 92].)

*Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, held the doctrine of contributory negligence is superseded by a system of comparative negligence which assesses liability in direct proportion to fault. In so holding, the defense of assumption of the risk was abolished to the extent it is merely a variant of the contributory negligence doctrine. (*Id.*, at p. 829.) Thus, under *Li,* unlike *Quinn,* neither contributory negligence nor assumption of the risk will absolutely bar Rudnick from recovery.

The tightly defined duty of the *Quinn* court and its defense of assumption of risk have given way to the modern era. Just as night baseball, relief pitchers, the live ball and designated hitters have totally changed the face of baseball since 1935, *Li* and *Rowland,* and their progeny, have changed, reshaped and modernized tort duty and available defenses. While I agree the "grand old game" has been treated in "a *sui generis* manner,"[2] there

---

[2]Majority opinion, *ante,* page 797.

is absolutely no support to suggest it is above the law and insulated from the duty and liabilities imposed on others.

Say it isn't so, Joe!